PREET BHARARA
United States Attorney for the
Southern District of New York
By:  DANIEL P. FILOR
     ELLEN LONDON
Assistant United States Attorneys
86 Chambers Street -- 3rd Floor
New York, New York 10007
Telephone: (212) 637-2726/2737
Facsimile: (212) 637-2717
Email:  Daniel.Filor@usdoj.gov
        Ellen.London@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re:                                        :        11 Civ. 270 (PGG) (JLC)
                                              :
AMBAC FINANCIAL GROUP, INC.,                  :        Bankr. Case No. 10-15973
                                              :        (SCC)
                       Debtor,                :
                                              :
_____          :
                                              :
AMBAC FINANCIAL GROUP, INC.,                  :
                                              :
                       Plaintiff,             :
                                              :        Adv. Pro. No.:  10-4210
v.                                            :
                                              :
UNITED STATES OF AMERICA,                     :
                                              :
                       Defendant.             :
                                              :
------------------------------------------------------------x

**MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION TO**
**WITHDRAW THE REFERENCE PURSUANT TO 28 U.S.C. § 157(d)**

# Table of Contents

Preliminary Statement ................................................................................ 1

Background ............................................................................................... 3

   A.  Ambac's Statement ......................................................................... 3

   B.  This Adversary Proceeding ............................................................ 6


Argument ................................................................................................. 7

      This Adversary Proceeding Should be Litigated in District Court ................ 7

   A.   Withdrawal of the Reference .......................................................... 7

   B.   This Adversary Proceeding Is Subject to Mandatory Withdrawal
      of the Reference Because It Implicates Substantial questions of
      Federal Tax Law .......................................................................... 9

        1.   Withdrawal of the Reference Is Mandatory Whenever a
           Proceeding Involves "Significant Interpretation" of
           Non-Bankruptcy Federal Law ............................................. 9

        2.   To Resolve This Case in Ambac's Favor Would Require the
           Court to Determine that the Method of Accounting Used by
           Ambac for CDSs "Clearly Reflects Income" Under IRC 446 ...... 13

        3.   To Resolve This Case in Ambac's Favor Would Require the
           Court to Make New Law and Find CDSs Are Notional
           Principal Contracts Under Treasury Regulation § 1.446-3. ..... 15

        4.   To Resolve This Case in Ambac's Favor Would Require
           Substantial Interpretation of Proposed Treasury
           Regulation § 1.446-3(g) as an Issue of First Impression
           by Any Court ...................................................................... 18

5.  Resolution of this Case Will Require a Determination of Whether Ambac Was Allowed to Change Its Method of Accounting on the CDSs Under IRC § 446 and Treasury Regulation § 1.446-1 .................................................................... 22

6.  Resolution of This Case and the Preliminary Injunction Motion Would Require the Court to Decide Whether the Bankruptcy Code Trumps the IRS's Rights to Collect Taxes Under the IRC ................................................................ 23

C.  This Court Should Withdraw the Reference as a Matter of Discretion ....................................................................... 28

1.  This Adversary Proceeding Is a Non-Core Proceeding ............. 29

2.  Withdrawal of the Reference Is in the Interests of Judicial Economy .................................................................................... 30

3.  Withdrawal of the Reference Will Save the Parties From Cost and Delay .......................................................................... 31

4.  Withdrawal Will Not Affect Administration of the Bankruptcy ........................................................................... 31

5.  Forum Shopping Is Not an Issue Here ...................................... 32

Conclusion ................................................................................................................ 32

# TABLE OF AUTHORITIES

## CASES

*American Bicycle Association v. United States (In re American Bicycle Ass'n)*,
   895 F.2d 1277 (9th Cir. 1990) ...................................................................................24

*American Telegraph & Telegraph Co. v. Chateaugay Corp.*,
   88 B.R. 581 (S.D.N.Y. 1988)......................................................................................11

*Bianco v. IRS*,
   No. 93 Civ. 3953, 1994 WL 538020 (S.D.N.Y. Oct. 3, 1994) ...................................26

*Burck v. Commissioner*,
   533 F.2d 768 (2d Cir. 1976).......................................................................................14

*Capital One Finance Corp. v. Commissioner*,
   130 T.C. 147 (2008)....................................................................................................22

*Century Hotels v. United States*,
   952 F.2d 107 (5th Cir. 1992) ......................................................................................11

*City of New York v. Exxon Corp.*,
   932 F.2d 1020 (2d Cir. 1991)......................................................................................10

*Dunmore v. United States*,
   358 F.3d 1107 (9th Cir. 2004) ....................................................................................30

*Eastern Airlines, Inc. v. Air Line Pilots Assoc. (In re Ionosphere Clubs, Inc.)*,
   No. 89 Civ. 8250 (MBM), 1990 WL 5203 (S.D.N.Y. Jan. 24, 1990) ..........................9

*Enron Corp. v. J.P. Morgan Secs., Inc. (In re Enron Corp.)*,
   Nos. 07 Civ. 10527 (SAS), 07 Civ. 10530 2008 WL 649770
   (S.D.N.Y. Mar. 10, 2008) ...........................................................................................10

*In re G-1 Holdings Inc.*,
   420 B.R. 216 (Bankr. D.N.J. 2009) ............................................................................27

*In re Hall*,
   123 B.R. 441 (Bankr. N.D. Ga. 1990) ........................................................................25

*Halper v. Halper*,
   164 F.3d 830 (3d Cir. 1999)........................................................................................29

*In re Horizon Air*,
 156 B.R. 369 (N.D.N.Y. 1993) ........................................................................9

*IRS v. CM Holdings, Inc. (In re CM Holdings, Inc.)*,
 221 B.R. 715 (D. Del. 1998) .....................................................................11, 12

*JPMorgan Chase & Co. v. Commissioner*,
 458 F.3d 564 (7th Cir. 2006) .......................................................................15

*Keene Corp. v. Williams Bailey & Wesner, LLP (In re Keene Corp.)*,
 182 B.R. 379 (S.D.N.Y. 1995) ....................................................................10

*Kohn v. Haymount Ltd. P'ship (In re Int'l Benefits Group, Inc.)*,
 No. 06-2363 (KSH), 2006 WL 2417297 (D.N.J. Aug. 21, 2006)...............31

*Laughlin v. IRS*,
 912 F.2d 197 (8th Cir. 1990) .......................................................................24

*LeCroy Research System Corp. v. Commissioner*,
 751 F.2d 123 (2d Cir. 1984)........................................................................20

*Linn v. Chivatero*,
 714 F.2d 1278 (5th Cir. 1983) .....................................................................25

*McCrory Corp. v. 99 Only Stores (In re McCrory Corp.)*,
 160 B.R. 502 (S.D.N.Y. 1993)....................................................................10

*Morelli v. Alexander*,
 920 F. Supp. 556 (S.D.N.Y. 1996) .............................................................25

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,
 458 U.S. 50 (1982)........................................................................................7

*In re Oil Company*,
 140 B.R. 30 (E.D.N.Y. 1992) ......................................................................11

*Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*,
 4 F.3d 1095 (2d Cir. 1993).....................................................................29, 30

*Pension Benefit Guaranty Corp. v. Pan Am Corp. (In re Pan Am Corp.)*,
 133 B.R. 700 (S.D.N.Y. 1991)....................................................................11

*In re Pressimone*,
 39 B.R. 240 (N.D.N.Y. 1984) .....................................................................25

*RCA Corp. v. United States*,
    664 F.2d 881 (2d Cir. 1981)................................................................................13, 14

*S.G. Phillips Constructors, Inc. v. Burlington (In re S.G. Phillips Constructors, Inc.)*,
    45 F.3d 702 (2d Cir. 1995)........................................................................................29

*Sec. Farms v. Int. Brotherhood of Teamsters*,
    124 F.3d 999 (9th Cir. 1997) ....................................................................................29

*Shugrue v. Air Line Pilots Associate (In re Ionosphere Clubs, Inc.)*,
    922 F.2d 984 (2d Cir. 1990)......................................................................................10

*Shugrue v. Pension Benefit Guaranty Corp. (In re Ionosphere Clubs, Inc.)*,
    142 B.R. 645 (S.D.N.Y. 1992)..................................................................................11

*South Street Seaport Ltd. Partnership v. Burger Boys, Inc. (In re Burger Boys, Inc.)*,
    94 F.3d 755 (2d Cir. 1996)........................................................................................29

*Sweet v. Sheahan*,
    235 F.3d 80 (2d Cir. 2000)........................................................................................20

*Thor Power Tool Co. v. Commissioner*,
    439 U.S. 522 (1979)..................................................................................................14

*U.S. Gypsum Co. v. National Gypsum Co. (In re National Gypsum Co.)*,
    145 B.R. 539 (N.D. Tex. 1992).................................................................................10

*United States v. Dalm*,
    494 U.S. 596 (1990)..................................................................................................24

*United States v. G-I Holdings, Inc. (In re G-I Holdings)*,
    295 B.R. 222 (D.N.J. 2003) ......................................................................................11

*United States v. Mitchell*,
    445 U.S. 535 (1980)..................................................................................................24

*United States v. Nordic Village, Inc.*,
    503 U.S. 30 (1992)....................................................................................................24

*United States v. Plainwell, Inc.*,
    No. 00-4350, 2004 WL 2345717 (D. Del. Oct. 7, 2004).............................................25

*Upton Printing Co. v. United States*,
   116 B.R. 66 (E.D. La 1989) ................................................................25

*Weiner v. IRS*,
   986 F.2d 12 (2d Cir. 1993)................................................................26

## STATUTES AND REGULATIONS

11 U.S.C. § 105...............................................................................24, 25

11 U.S.C. § 106...............................................................................24, 25

11 U.S.C. § 362...............................................................................24, 25

11 U.S.C. § 505(a)(1)...........................................................................12

26 U.S.C. § 446.........................................................................13, 22, 23

26 U.S.C. §§ 6213.................................................................................26

26 U.S.C. § 6231...................................................................................26

26 U.S.C. § 6331...................................................................................26

26 U.S.C. § 7421(a)..............................................................................24

26 U.S.C. § 7426 ..................................................................................12

28 U.S.C. § 157....................................................1, 7, 8, 9, 12, 28, 29, 30

28 U.S.C. § 1346(a)(1)..........................................................................30

26 C.F.R. § 1.446-1(a)(2)......................................................................13

26 C.F.R. §1.446-3..........................................................................17, 19

Defendant the United States of America, by and through its attorney Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion for withdrawal of the reference to the United States Bankruptcy Court for the Southern District of New York of this adversary proceeding, pursuant to 28 U.S.C. § 157(d).

## PRELIMINARY STATEMENT

In this adversary proceeding, Ambac Financial Group, Inc. ("Ambac" or "Debtor") is seeking a declaration that it has no tax liability for tax years 2003 through 2008 and that it is entitled to retain tax refunds that were tentatively paid to it by the Internal Revenue Service (the "IRS"). Ambac also is seeking an injunction restraining the IRS from taking any enforcement action against Ambac's non-debtor subsidiaries without first providing Ambac with five days' notice of such action.

At the heart of Ambac's case is its contention that its method of accounting for credit default swaps ("CDSs") – which was the basis for its recovery of tentative tax refunds of over $700 million – was proper. The resolution of that issue will require the court that decides this case to wrestle with difficult and novel questions of tax law; it will require minimal consideration of the Bankruptcy Code, however. First, this case raises the issue of whether Ambac's chosen method of accounting for CDSs "clearly reflects income," as required by Section 446 of the Internal Revenue Code (the "IRC") and whether it represents a permissible interpretation of the applicable Treasury regulations, as well as a proposed regulation. The case also

involves an assessment of how CDSs must be characterized under the Internal Revenue Code.  In addition, there are questions of first impression relating to whether Ambac properly changed its method of accounting.

*All* of these are substantial questions that implicate pure federal tax law; they have virtually nothing to do with either the administration of this bankruptcy or with the bankruptcy laws generally.  And the questions at the center of this case — interpretation of IRC provisions and Treasury regulations — are ones of first impression.  They are also questions of national importance given the potential tax effects of adopting Ambac's proposed method of accounting for CDS contracts in light of the huge dollar values of CDS contracts entered into by many unrelated entities across the nation.

Finally, resolution of the adversary proceeding would require a determination of whether the injunction Ambac seeks is an improper abrogation of the government's sovereign immunity.  The injunction sought in the second count of Ambac's adversary proceeding complaint, as well as its motion for preliminary injunction, implicates federal tax questions arising from the IRC and potential conflicts between the IRC and the Bankruptcy Code.  Ambac seeks an injunction against the IRS preventing the IRS from utilizing its statutory powers under various provisions of the IRC to take any collection actions regarding tax liabilities against a large number of non-debtor affiliated companies unless IRS provides Debtor with five days' notice.  The allegation that the bankruptcy court's equitable

powers can trump the IRC is a weighty question involving the intersection of the Bankruptcy Code and IRC that should be decided by the district court.

Put simply, this case belongs in district court. Withdrawal of the reference is mandatory when resolution of the proceeding requires the court to decide substantial questions of non-bankruptcy federal law. Ambac's complaint makes clear that this is such a case. And even when not mandatory, withdrawal is permitted upon a showing of cause that turns mostly on considerations of judicial economy, which warrant withdrawal here.

## BACKGROUND

**A.    Ambac's Bankruptcy**

According to Debtor's complaint, Ambac is a holding company that depends on dividends from its wholly-owned subsidiary Ambac Assurance Corporation ("AAC") in order to meet its financial obligations. Complaint for Injunctive Relief and Declaratory Judgment Determining Amount of Tax Liability ("Compl.") ¶ 11. AAC is a "financial guaranty insurance company" based in Wisconsin and regulated by the Office of the Commissioner of Insurance of the State of Wisconsin ("OCI"). *Id.* In 1998, AAC created a limited liability company called Ambac Credit Products LLC ("ACP") to write credit default swaps in which ACP sold credit protection relating to "municipal and corporate obligations and asset-backed securities" (collectively, "Reference Obligations"). *Id.* ¶ 16. Because ACP is a disregarded entity, "AAC is treated as the party to the CDSs for federal income tax purposes." *Id.*

3

Between 1999 and 2004, ACP's CDS contracts obligated AAC to purchase a Reference Obligation upon the occurrence of a credit event. *Id.* ¶ 17. The contracts subsequently required cash settlement, as opposed to physical settlement. *Id.* Ambac treated these contracts as put options for purposes of calculating its federal income taxes. *Id.*

ACP allegedly changed the form of its CDS contracts in 2005 so that the contracts no longer required physical or cash settlement and contract termination at the time of a credit event. *Id.* ¶ 18. Instead, ACP is required "to make payments to the counterparty each time the issuer of a Reference Obligation fails to pay either scheduled interest or principal (unless ACP exercises its right to purchase the Reference Obligation)." *Id.* In exchange, the counterparty is obligated to make certain payments to ACP that are calculated in accordance with "(i) a fixed rate, (ii) a notional amount that varies based on objective financial information about the underlying Reference Obligations . . ., and (iii) a specified interval." *Id.*

Ambac treated the post-2004 CDS contracts the same as the pre-2005 CDS contracts in its income tax returns for the tax years 2005 and 2006. *Id.* ¶ 20. However, in 2008, Ambac reported losses for the first time on its CDS contracts. *Id.* ¶ 21. Working with its accounting firm KPMG, Ambac then decided that it could classify post-2004 CDS contracts as "notional principal contracts" rather than as put options. *Id.* ¶ 22. Ambac consequently interpreted Proposed Treasury Regulation § 1.446-3(g)(6), which addresses notional principal contracts, as applying to the CDS contracts and as permitting the use of the impairment method of

4

accounting.  *Id*.  In April 2008, Ambac filed a request with the IRS for a change in accounting method using IRS Form 3115, seeking permission to use the impairment method.  *Id*. ¶ 23.  Subsequently, Ambac filed a supplemental letter in September 2008 asserting that it was in fact entitled to adopt the impairment method of accounting as to losses; its reasoning for this was that it had not in fact adopted an accounting method for losses, having never suffered losses prior to 2007.  *Id*.

Applying the impairment method to its losses, Ambac "treated as an ordinary loss the amount it estimated it would be required to pay in respect of the CDSs."  *Id*. ¶ 24.  This allegedly allowed Ambac to report $33 million in losses for 2007 and $3.2 billion in losses for 2008.  *Id*.  On the bases of these purported losses, Ambac filed claims for tentative carryback adjustments on September 23, 2008, August 11, 2009, and December 21, 2009.  *Id*. ¶ 27.  In response, the IRS tentatively refunded to Ambac:  $11,470,930 in December 2008; $252,704,185 in September 2009; and $443,940,722 in February 2010.  *Id*.  Ambac distributed these funds to AAC pursuant to a tax sharing agreement.  *Id*. ¶ 29.

In March 2010, AAC received OCI's approval to establish a "segregated account," pursuant to Wisconsin law, and the OCI commenced rehabilitation proceedings with regard to this segregated account.  *Id*. ¶ 12.  OCI filed a plan of rehabilitation on October 8, 2010, and a confirmation hearing was held in November 2010.  *Id*. ¶ 14.  OCI, Ambac, and a committee of senior noteholders entered into a term sheet in which the parties agreed to allocate any liabilities relating to the IRS tentative tax refunds to the segregated account.  *Id*. ¶ 41.  In

5

addition, on November 8, 2010, OCI obtained a state court injunction purportedly preventing the IRS from taking any enforcement actions against AAC and its subsidiaries (the "State Court Injunction"). *Id*. The Government has sought to remove the rehabilitation proceeding to federal district court in Wisconsin and to have the State Court Injunction vacated by the district court.

On October 28, 2010, the IRS issued an Information Document Request ("IDR") to Ambac seeking information regarding the tentative refunds and the accounting method that was the purported basis for the refunds. *Id*. ¶ 30.

On November 9, 2010, Ambac commenced a voluntary case under Chapter 11 of the Bankruptcy Code. *Id*. ¶ 4. Only Ambac, the holding corporation, and not any of its operating subsidiaries, is a debtor in the Chapter 11 bankruptcy. *Id*. ¶¶ 9, 11.

## B.   This Adversary Proceeding

On November 9, 2010, Ambac also filed its adversary proceeding seeking a declaratory judgment that Ambac has no tax liability for tax years 2003 through 2008 and is entitled to keep the tentative refunds and an injunction preventing the IRS from taking any enforcement action that would violate the State Court Injunction without providing five days' prior notice. *Id*. ¶ 2. On the same day, Ambac filed a motion for a temporary restraining order and preliminary injunction, also seeking to restrain the IRS from taking enforcement action contrary to the State Court Order without five days' prior notice. *See* Motion for Temporary Restraining Order and Preliminary Injunction Pursuant to Sections 105(a) and

362(a) of the Bankruptcy Code and Rule 7065 of the Bankruptcy Rules [Docket No. 2] (the "PI Motion").

A hearing was held on the afternoon of November 9, 2010 – the same day that Ambac filed its adversary complaint and the PI Motion – at which the IRS agreed to provide five days' notice prior to taking any enforcement action that would violate the State Court Injunction until such time as the PI Motion is decided.

## ARGUMENT

## THIS ADVERSARY PROCEEDING SHOULD BE LITIGATED IN DISTRICT COURT

### A.   Withdrawal of the Reference

In 1982, the Supreme Court ruled unconstitutional the broad grant of jurisdiction to bankruptcy judges contained in the Bankruptcy Act of 1978, which included the authority to hear and finally determine all bankruptcy-related matters.  *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).  Congress reacted by enacting the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333 (1984).  Section 104 of the Act created 28 U.S.C. § 157, which defines the relationship between bankruptcy courts and district courts.

Despite the fact that district courts have "original and exclusive jurisdiction of all cases under title 11," 28 U.S.C. § 1334(a), a district court may "refer[] to the bankruptcy judges for the district" any or all bankruptcy cases.  28 U.S.C. § 157(a).  Since 1984, all bankruptcy cases in this district have been referred to the

bankruptcy courts.  *See* Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting *C.J.*).

Once a case has been referred to the bankruptcy court, the extent to which that court may "finally determine" a matter depends on the case.  A bankruptcy judge can "hear and determine" cases "under" title 11 as well as so-called "core proceedings."  28 U.S.C. § 157(b).  But, absent the parties' consent, a bankruptcy judge may only submit proposed findings of fact and conclusion of law in non-core proceedings, which are to be reviewed *de novo* by a district judge.  *See* 28 U.S.C. § 157(c).

Finally, the district court may withdraw the reference of a case (or part of a case) to the bankruptcy court and re-assert its exclusive jurisdiction:

> The district court *may* withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown.  The district court *shall*, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d) (emphases supplied).  The two sentences of section 157(d) are read separately, and are generally referred to as, respectively, the "permissive" and the "mandatory" withdrawal provisions.  "A motion for withdrawal of a case or proceeding shall be heard by a district judge."  Fed. R. Bankr. P. 5011(a).

**B.     This Adversary Proceeding Is Subject to Mandatory Withdrawal of the Reference Because It Implicates Substantial Questions of Federal Tax Law**

This case raises numerous issues of first impression that implicate non-bankruptcy law.  Specifically, resolution of the case will require interpreting several IRC provisions and Treasury Regulations, as well as an assessment of a conflict between the Bankruptcy Code and the IRC.  Accordingly, this case falls within the well-established parameters for mandatory withdrawal of the reference.

**1.     Withdrawal of the Reference Is Mandatory Whenever a Proceeding Involves "Significant Interpretation" of Non-Bankruptcy Federal Law**

The mandatory withdrawal provision specifies that a "district court *shall . . .* withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."  28 U.S.C. § 157(d) (emphasis supplied).  This is undisputedly such a case.

The purpose of the mandatory withdrawal provision is "to assure that an Article III judge decides issues calling for more than routine application of [federal] statutes outside the Bankruptcy Code."  *In re Horizon Air*, 156 B.R. 369, 373 (N.D.N.Y. 1993) (citing *Eastern Airlines, Inc. v. Air Line Pilots Assoc. (In re Ionosphere Clubs, Inc.)*, No. 89 Civ. 8250 (MBM), 1990 WL 5203, at *5 (S.D.N.Y. Jan. 24, 1990)).  Thus, section 157(d) requires withdrawal of the reference for any proceeding "that would otherwise require a bankruptcy court judge to engage in significant interpretation, as opposed to simple application, of federal laws apart

from the bankruptcy statutes." *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991); *see also U.S. Gypsum Co. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 145 B.R. 539, 541 (N.D. Tex. 1992).

Under this standard, a district court is required to withdraw the reference whenever "substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding." *Shugrue v. Air Line Pilots Assoc. (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 995 (2d Cir. 1990) (internal quotation marks omitted); *see also McCrory Corp. v. 99¢ Only Stores (In re McCrory Corp.)*, 160 B.R. 502, 505 (S.D.N.Y. 1993) (same). Courts in this circuit have "recognized that the mandatory withdrawal standard is more easily satisfied when complicated issues of first impression are implicated under non-bankruptcy federal laws," *Keene Corp. v. Williams Bailey & Wesner, LLP (In re Keene Corp.)*, 182 B.R. 379, 382 (S.D.N.Y. 1995), but in fact the mandatory withdrawal provision of section 157(d) requires withdrawal of the reference whenever a proceeding pending in bankruptcy court involves anything more than the routine application of non-bankruptcy laws. *See In re Keene Corp.*, 182 B.R. at 382 (withdrawal of the reference "warranted when resolution of the matter would require the bankruptcy judge to 'engage in significant interpretation, as opposed to simple application,' of federal non-bankruptcy statutes" (quoting *Exxon*, 932 F.2d at 1026)).

"Withdrawal of the reference may also be mandated where 'issues arising under non-title 11 laws dominate[] those arising under title 11. . . .'" *Enron Corp. v. J.P. Morgan Secs., Inc. (In re Enron Corp.)*, Nos. 07 Civ. 10527 (SAS), 07 Civ. 10530

10

(SAS), 2008 WL 649770, at *4 (S.D.N.Y. Mar. 10, 2008) (ellipsis in original) (quoting *In re Texaco Inc.*, 84 B.R. 911, 921 (S.D.N.Y. 1988)).  "In such cases, a district court does not have discretion to deny a petition for withdrawal." *American Tel. & Tel. Co. v. Chateaugay Corp.*, 88 B.R. 581, 584 (S.D.N.Y. 1988).

Courts applying these standards routinely withdraw the reference in cases that implicate substantial questions of tax law.  *See, e.g., United States v. G-I Holdings, Inc. (In re G-I Holdings)*, 295 B.R. 222, 224 (D.N.J. 2003) (holding withdrawal was mandatory where proceeding required significant interpretation of federal tax statutes, case was factually complex one regarding whether disguised sale occurred for tax purposes, and case was one of first impression); *IRS v. CM Holdings, Inc. (In re CM Holdings, Inc.)*, 221 B.R. 715, 722-24 (D. Del. 1998) (holding withdrawal was mandatory where objection to IRS claim presented unsettled issues of law, as well as issues of first impression, relating to tax treatment of corporate-owned life insurance); *Shugrue v. Pension Benefit Guar. Corp. (In re Ionosphere Clubs, Inc.)*, 142 B.R. 645, 649 (S.D.N.Y. 1992) (holding withdrawal was mandatory where resolution of adversary proceeding required significant interpretation of IRC and ERISA); *In re Oil Company*, 140 B.R. 30, 34-35 (E.D.N.Y. 1992) (holding withdrawal was mandatory where objection to IRS claim presented issues of first impression under IRC); *Pension Benefit Guar. Corp. v. Pan Am Corp. (In re Pan Am Corp.)*, 133 B.R. 700, 704 (S.D.N.Y. 1991) (holding withdrawal was mandatory where objection to claim involved interaction of Bankruptcy Code, IRC, and ERISA); *see also Century Hotels v. United States*, 952

11

F.2d 107, 108 n.1 (5th Cir. 1992) (noting that district court had withdrawn the reference of adversary proceeding seeking turnover of property and asserting wrongful levy claim under I.R.C. § 7426). *See generally* T. Keith Fogg, Grover Hartt, III & Mark S. Wallace, *When, Why, and How Should a District Court Be Asked to Withdraw the Reference of a Tax Controversy to a Bankruptcy Court?*, 20 Prac. Tax. Law. 41 (2006).[1]  These cases also confirm the readily apparent proposition that the IRC contains non-bankruptcy "laws of the United States regulating organizations or activities affecting interstate commerce," 28 U.S.C. § 157(d).  *See, e.g., In re CM Holdings*, 221 B.R. at 721 ("the federal Tax Code must be consulted in order to determine the validity of the IRS' claims and federal tax law regulates organizations or activities affecting interstate commerce, as required under 28 U.S.C. § 157(d)").

Under any standard, this is a case for mandatory withdrawal.  It presents several substantial questions of first impression requiring the interpretation of the IRC and Treasury regulations.  Any one of them provides a sufficient basis for mandatory withdrawal.

---

[1] Of course, where resolution of a tax claim would not involve substantial interpretation of the IRC or Treasury regulations, but is merely a routine application of settled law, the bankruptcy court is fully empowered to "determine the amount or legality of any tax."  11 U.S.C. § 505(a)(1).

    **2.    To Resolve This Case in Ambac's Favor Would Require the Court to Determine that the Method of Accounting Used by Ambac for CDSs "Clearly Reflects Income" Under IRC § 446.**

Any method of accounting that a taxpayer adopts must comply with Section 446 of the IRC, which provides as follows:

> (a) General rule. – Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

> (b) Exceptions. – If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

26 U.S.C. § 446; *see also* 26 C.F.R. § 1.446-1(a)(2) (stating that "no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income"). This case involves the question of whether Ambac's use of the impairment method of accounting for the CDS contracts clearly reflected its income pursuant to IRC § 446, which will require a substantial consideration of the federal tax law.

The Second Circuit analyzed the application of IRC § 446 in *RCA Corp. v. United States*, 664 F.2d 881 (2d Cir. 1981), in which the IRS Commissioner had rejected the use of the accrual method of accounting for certain prepaid service contract revenues as not "'not clearly reflect(ing) income,'" *id.* at 882. At trial, plaintiff RCA made several arguments to support its contention that this method clearly reflected its income, including by reference to several regulations and revenue rulings. The government responded that several Supreme Court cases

supported the Commissioner's position, that RCA improperly adopted this method of accounting, and that the regulations in question were inapplicable. Nevertheless, the district court ruled in favor of RCA, and the government appealed.

On appeal, the Second Circuit explained that the Commissioner was entitled to "'broad discretion,'" and that the case law supported the Commissioner's determination. *Id.* at 886 (quoting *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 540 (1979)). The court's determination was based on a thorough review of not only the case law, but the underlying policies of the decisions as well. Specifically, the court explained that according to relevant Supreme Court precedents, "it is not simply the 'artificiality' of a taxpayer's method of deferring recognition of income . . . that offends the clear reflection principle of s 446(b), but rather the uncertainty inherent in any method that relies on prognostications and assumptions . . . ." *RCA*, 664 F.2d at 888. This case demonstrates that a section 446 assessment implicates significant legal and policy questions. *See also Burck v. Comm'r*, 533 F.2d 768, 773 (2d Cir. 1976) ("In order to assure accuracy in the difficult, particular determination whether the taxpayer's income is clearly reflected, it has been necessary to recognize that the Commissioner must be given '[m]uch latitude for discretion' in his analysis of the taxpayer's accounting methodology.") (quoting *Lucas v. Am. Code Co.*, 280 U.S. 445, 449 (1930)).

In addition to the fact that this determination is inherently a difficult analysis of federal tax law, the issue here is "novel," given that no courts have assessed whether the use of the impairment method with CDSs clearly reflects

14

income.  *See JPMorgan Chase & Co. v. Comm'r*, 458 F.3d 564, 567 (7th Cir. 2006).

In *JPMorgan Chase*, the court reviewed the tax court's determination of the "novel

issue" of "the proper calculation of the fair market value of interest swaps to report

as income."  *Id.* at 567.  Under the IRC, interest swaps "must be valued at their fair

market value on the last business day of the taxable year," *id.* at 568; however, the

issue of what accounting method of calculating fair market value clearly reflected

income required the Commissioner and the taxpayer to engage in lengthy litigation

involving numerous experts and computations, *id.* at 567.  Here, the assessment of

whether the unprecedented use of the impairment method of accounting for

Ambac's credit default swaps clearly reflects income will similarly require

significant analysis that has never been conducted by any court.  Because such

effort will be expended solely in light of the standards of the IRC, as opposed to the

Bankruptcy Code, mandatory withdrawal of the reference is appropriate.

### 3. To Resolve This Case in Ambac's Favor Would Require the Court to Make New Law and Find CDSs Are Notional Principal Contracts Under Treasury Regulation § 1.446-3.

Debtor's use of the impairment method of accounting is contingent upon a

determination that "Post-2004 CDS Contracts are [notional principal contracts] for

federal income tax purposes."  Compl. ¶ 50.  This is because Debtor asserts that

payments made under these contracts constitute nonperiodic payments pursuant to

Treasury Regulation § 1.446-3(f)(1), which only applies to notional principal

contracts ("NPCs").  Debtor concedes, though, that the "IRS has not yet

promulgated any guidance with respect to CDS contracts."  *Id.* ¶ 19.

15

Treasury Regulation § 1.446-3(c) states that:

> A notional principal contract is a financial instrument that provides for the payment of amounts by one party to another at specified intervals calculated by reference to a specified index upon a notional principal amount in exchange for specified consideration or a promise to pay similar amounts.

Such notional principal contracts ("NPCs") "include interest rate swaps, currency swaps, basis swaps, interest rate caps, interest rate floors, commodity swaps, equity swaps, equity index swaps, and similar agreements." *Id.* The determination of whether a particular financial instrument is covered by this definition is important because the regulations "prescrib[e] accounting methods that reflect the economic substance of such contracts." *Id.* at § 1.446-3(b).

While Debtor offers its own analysis of why the Post-2004 CDS contracts should be deemed to fit within the definition of NPC provided in Treasury Regulation §1.446-3, *see* Compl. ¶ 52, this is neither settled nor straightforward. Courts have yet to assess the way that CDS contracts should be treated for accounting purposes, an assessment that will have consequences far beyond this case. *See* Thomas A. Humphreys, *The Way (Securitization) Things Ought to Be*, 898 Practicing Law Institute/Tax 133, 155 (2009) (noting that there is a tax issue as to "whether the credit default swap is a notional principal contract, an option, insurance contract, a guarantee contract or merely another financial instrument"); Bruce E. Kayle, *The Federal Income Tax Treatment of Credit Derivative Transactions*, 897 Practicing Law Institute/Tax 1071, 1108-09 (2009) (explaining that it "is not as clear" that a credit default swap is an NPC for several reasons,

16

including that it "may be sufficiently close in substance to other arrangements, like an option or a guarantee, that it simply should not be allowed to be treated as a notional principal contract where there are substantively different tax results to the parties"); Andrew M. Kulpa, *Minimal Deterrence:  The Market Impact, Legal Fallout, and Impending Regulation of Credit Default Swaps*, 5 J.L. Econ. & Pol'y 291, 298 (2009) (discussing the "[d]ifficulty in establishing a consistent tax framework" for CDSs).  Because it is an unsettled question of law that will require a substantial consideration of federal tax law, the district court should make the determination as to whether Debtor is correct that its CDSs are NPCs.

        In addition, Debtor contends that it is permissible to use its impairment method of accounting because its "Post-2004 CDS Contracts do not constitute IRC section 1256 contracts, future contracts, forward contracts, options, or debt." Compl. ¶ 58.  The legal issue of whether CDSs are options or other types of financial instruments identified by Debtor is critical because "[a] contract described in section 1256(b), a futures contract, a forward contract, and an option are not notional principal contracts."  26 C.F.R. §1.446-3(c)(ii).  Whether CDSs are options is a challenging question of federal tax law that has not been determined by any court. Commentators have written extensively about the topic and have disagreed whether CDSs are options.  *See, e.g.*, Kevin J. Liss, *The Option Conundrum in Tax Law: After All These Years What Exactly Is An Option?*, 63 Tax Law 307, 374 (2010) (arguing that "[c]redit default swaps are quintessential examples of what this Article describes as a trigger option," and that "these derivative products should be

17

recognized as options for tax purposes," but acknowledging that "most taxpayers currently treat their credit default swaps as NPCs"); Ari J. Brandes, *A Better Way to Understand the Speculative Use of Credit Default Swaps*, 14 Stan. J.L. Bus. & Fin. 263 (2009) (arguing that CDSs should be taxed as options); Kayle, 897 PLI/Tax at 1121 (noting that "[a] credit default swap arguably meets the . . . criteria . . . of an option").

The significant interpretation of Treasury Regulation §1.446-3 to determine whether CDSs are options, NPCs, or any other instrument, should be conducted by a federal district court, particularly when this interpretation has never been conducted by any other courts.

### 4.   To Resolve This Case in Ambac's Favor Would Require Substantial Interpretation of Proposed Treasury Regulation § 1.446-3(g) as an Issue of First Impression by Any Court.

Debtor contends that it is entitled to use the impairment method of accounting on the basis of Proposed Treasury Regulation § 1.446-3. Compl. ¶¶ 65-73.

First, Debtor asserts that payments pursuant to the Post-2004 CDS Contracts are not "termination payments" and should be characterized as "contingent nonperiodic payments" under the proposed regulation. *Id.* ¶¶ 64, 65. However, no court has yet evaluated CDSs to address these issues. Accordingly, a court will be required to determine, both as issues of first impression, whether the payments under the Post-2004 CDS Contracts are (i) "termination payments,"

pursuant to 26 C.F.R. §1.446-3(h)[2], and (ii) "nonperiodic payments," pursuant to 26 C.F.R. §1.446-3(f)(1).[3]

Debtor also notes that the proposed regulation provides for two methods of accounting for contingent nonperiodic payments under NPC's that are reasonable, namely the "noncontingent swap" method and the "mark-to-market" method. *Id.* ¶ 66. The Preamble to the proposed regulation states that:

> With respect to NPCs that provide for contingent nonperiodic payments and that are in effect or entered into on or after 30 days after the publication of these proposed regulations in the Federal

---

[2] The Treasury Regulation defines "termination payments" as:
> A payment made or received to extinguish or assign all or a proportionate part of the remaining rights and obligations of any party under a notional principal contract is a termination payment to the party making the termination payment and the party receiving the payment. A termination payment includes a payment made between the original parties to the contract (an extinguishment), a payment made between one party to the contract and a third party (an assignment), and any gain or loss realized on the exchange of one notional principal contract for another. Where one party assigns its remaining rights and obligations to a third party, the original nonassigning counterparty realizes gain or loss if the assignment results in a deemed exchange of contracts and a realization event under section 1001.

26 C.F.R. §1.446-3(h).

[3] The Treasury Regulation defines "nonperiodic payments" as:
> A nonperiodic payment is any payment made or received with respect to a notional principal contract that is not a periodic payment (as defined in paragraph (e)(1) of this section) or a termination payment (as defined in paragraph (h) of this section). Examples of nonperiodic payments are the premium for a cap or floor agreement (even if it is paid in installments), the payment for an off-market swap agreement, the prepayment of part or all of one leg of a swap, and the premium for an option to enter into a swap if and when the option is exercised.

26 C.F.R. §1.446-3(f)(1).

> Register, if a taxpayer has not adopted a method of accounting for these NPCs, the taxpayer must adopt a method that takes contingent nonperiodic payments into account over the life of the contract under a reasonable amortization method.

*Id.* ¶ 67; Preamble to Proposed Treas. Reg. § 1.446-3, 69 Fed. Reg. 8886-01, 8891 (Feb. 26, 2004).  Debtor alleges that the impairment method of accounting is a "reasonable amortization method" because it is "similar to the mark-to-market method, which the IRS Contingent Swap Rules under the 2004 proposed Treasury Regulations deem to be a reasonable method."  Compl. ¶ 69.

As an initial matter, there is a significant question of non-bankruptcy law as to whether Debtor is entitled to rely on the proposed Treasury regulation at issue here.  In order to rely on the proposed regulation, Debtor would need to make new law because it is well established "that proposed regulations . . . have no legal effect."  *Sweet v. Sheahan*, 235 F.3d 80, 87 (2d Cir. 2000); *see also LeCroy Research Sys. Corp. v. Comm'r*, 751 F.2d 123, 127 (2d Cir. 1984) ("Proposed regulations are suggestions made for comment; they modify nothing.  If the Commissioner wanted this regulation to have binding effect, it could have been issued as a temporary regulation. . .") (citation omitted).  While the Preamble states that the "reasonable amortization method" standard takes effect 30 days after publication of the proposed regulations, the same Preamble also states that the mark-to-market standard, on which Debtor relies as a point of comparison, was not yet effective.  69 Fed. Reg. 8886-01, 8887.  Specifically, the Preamble states that the "substantive rules," which includes the guidelines for the mark-to-market method, "are proposed

to apply to NPCs entered into on or after 30 days after the date of publication of the final regulations in the Federal Register." *Id.* at 8890.  Debtor would need a court to make new law in order to hold that Debtor is entitled to rely on the proposed regulation, which never became final, in support of its assertion that its method is a "reasonable amortization method."

Even if Debtor were entitled to rely on these sections of the proposed regulation, however, the court would need to decide another issue of first impression, *i.e.*, whether the impairment method of accounting allegedly used by Debtor is a "reasonable amortization method" to apply to CDS contracts.  The court would need to determine whether Ambac is correct in its assertion that the impairment method is in fact "similar to the mark-to-market method."  Compl. ¶ 69.  The court also would need to determine whether this method uses, as Ambac asserts, "an objective and reliable standard to determine changes in the fair market value of an NPC."  *Id.* ¶ 72.  Because there is no case law applying the proposed regulation, it is not even clear what standard a court would use in making this novel determination.  Accordingly, resolution of this question would require a significant interpretation of the proposed Treasury regulation, which should be made by a district court in the first instance.  Mandatory withdrawal therefore is appropriate.

5.    **Resolution of this Case Will Require a Determination of Whether Ambac Was Allowed to Change Its Method of Accounting on the CDSs Under IRC § 446 and Treasury Regulation § 1.446-1.**

In accordance with IRC § 446(e) and Treasury Regulation § 1.446-1(e)(2), Ambac was required to "secure the consent" of the IRS in order to change its method of accounting of "any material item."  Ambac requested authorization to change its method of accounting in 2008, but the IRS did not approve the request.  Compl. ¶ 23.  It is the position of the Government that, pursuant to IRC § 446(e) and Treasury Regulation § 1.446-1(e)(2), Ambac was not allowed to change its method of accounting on the CDSs because it failed to "secure the consent" of the IRS.  *See Capital One Fin. Corp. v. Comm'r*, 130 T.C. 147 (2008).  For example, in holding that petitioner's alleged recharacterization of late-fee income was an impermissible change in the method of accounting under IRC § 446(e), the Tax Court in *Capital One* explained that the phrase "method of accounting" is not defined in the IRC, but applied the court's prior definition and interpretation of the Treasury Regulations to find that a change in the treatment of late-fee income was a change in the treatment of a "material item" that required the IRS to authorize the change in the method of accounting, which had not occurred.  *See id.* at 164-69.

Ambac alleges in its adversary proceeding complaint that, in September 2008, it "clarified" its original April 2008 request to change its method of accounting by indicating that it had never adopted any accounting method "with respect to the losses" on its CDSs.  Compl. ¶ 23.  Ambac appears to be arguing that it should be

22

either excused from the requirement of obtaining authorization from the IRS for its

accounting change, or that the requirement did not apply because Ambac's prior

method of accounting applied only to the gains on its CDSs.  Accordingly, to succeed

in this case, Ambac would need to make new law and have the court determine that

a taxpayer could adopt different methods of accounting for gains and losses for

CDSs without implicating IRC § 446(e) and Treasury Regulation § 1.446-1(e)(2).

Such an issue of first impression requires mandatory withdrawal of the reference.

6.  **Resolution of This Case and the Preliminary Injunction Motion Would Require the Court to Decide Whether the Bankruptcy Code Trumps the IRS's Rights to Collect Taxes Under the IRC.**

In the second count of the adversary complaint, Debtor seeks an injunction

against the IRS preventing the IRS from utilizing its statutory powers under

various provisions of the IRC to take any collection actions regarding tax liabilities

against Debtor's affiliated non-debtor companies unless IRS provides Debtor with

five days' notice.  Compl. ¶¶ 83, 85; *see also id.* ¶¶ 33, 34 (describing otherwise

permissible IRS enforcement actions under the IRC without notice).  Debtor's

pending PI Motion similarly seeks to prevent IRS from taking collection actions

against Debtor's affiliated non-debtors without providing five days' notice.  *See* PI

Motion at 1-2; ¶¶ 17, 45; *see also id.* ¶¶ 41, 42 (describing IRS's usual ability to lien

or levy without notice).  The relief sought by Debtor is unprecedented and would

violate the IRS's sovereign rights under the IRC.  The allegation that the

bankruptcy court's equitable powers can trump the IRC as alleged is a weighty

question that should be decided by the district court.

It is well established that the United States has sovereign immunity unless it consents to suit. *United States v. Dalm*, 494 U.S. 596, 608 (1990).  A waiver of sovereign immunity must be explicit, and any waiver is strictly construed in favor of the sovereign. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992).  Waivers of sovereign immunity are not to be "liberally construed." *Id.*  Failure to waive sovereign immunity by the United States deprives a federal court of subject matter jurisdiction. *United States v. Mitchell*, 445 U.S. 535, 538 (1980).

The Anti-Injunction Act states:  "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."  26 U.S.C. § 7421(a).  While Congress provided a waiver of the Government's sovereign immunity for bankruptcy courts to issue orders preventing Government actions against a debtor in bankruptcy, *see* 11 U.S.C. §§ 105, 106, 362, courts have established that sovereign immunity has not been waived to allow a bankruptcy court to enjoin IRS assessment and collection actions against non-debtors, and the Anti-Injunction Act prohibits an injunction against the IRS regarding non-debtors. *See Laughlin v. IRS*, 912 F.2d 197, 199-200 (8th Cir. 1990) (Anti-Injunction Act barred entry of order requiring IRS to provide more detail in notice of levy to trustee of Chapter 13 bankruptcy estates or to file adversary proceeding before filing notice of levy); *American Bicycle Ass'n v. United States (In re American Bicycle Ass'n)*, 895 F.2d 1277, 1279-80 (9th Cir. 1990) (Bankruptcy Code § 105 does not override Anti-Injunction Act, and bankruptcy court cannot enjoin IRS from

24

collecting penalty against responsible officer of debtor corporation); *In re Bankr. Court's Use of a Standardized Form of Chapter 13 Confirmation Order that Enjoins IRS to Redirect Tax Refunds to Chapter 13 Trustees*, 423 B.R. 294, 300-02 (E.D. Mich. 2010); (Anti-Injunction Act bars bankruptcy court from directing IRS to submit debtor's future tax refunds to Trustees); *United States v. Plainwell, Inc.*, No. 00-4350, 2004 WL 2345717, at *2 (D. Del. Oct. 7, 2004) (sovereign immunity precluded bankruptcy court order enjoining IRS from collecting taxes from debtor's officers and directors); *In re Hall*, 123 B.R. 441, 444 (Bankr. N.D. Ga. 1990) (Anti-Injunction Act bars injunction against IRS to collect joint taxes of debtor from her non-debtor husband); *Upton Printing Co. v. United States*, 116 B.R. 66, 66-67 (E.D. La. 1989) (Anti-Injunction Act precludes injunction against IRS collecting penalty from debtor's president and sole shareholder); *In re Pressimone*, 39 B.R. 240, 246 (N.D.N.Y. 1984) (Anti-Injunction Act bars injunction against IRS under § 105 to collect joint taxes of debtor from her non-debtor husband).

The Anti-Injunction Act is "broadly construed to include not only assessment and collection, but also 'activities which are intended to or may culminate in the assessment or collection of taxes.'" *See Morelli v. Alexander*, 920 F. Supp. 556, 559 (S.D.N.Y. 1996) (quoting *Linn v. Chivatero*, 714 F.2d 1278, 1282 (5th Cir. 1983) (Anti-Injunction Act bars taxpayer from bringing suit for pre-enforcement review of notice of intent to levy and other notices received from IRS; stating that "purpose of § 7421 is to protect the government's need to assess and collect taxes as expeditiously as possible with a minimum of pre-enforcement judicial interference");

25

*see also Weiner v. IRS*, 986 F.2d 12, 13 (2d Cir. 1993) (taxpayer suit seeking apology or explanation of errors that caused improper levy barred by Anti-Injunction Act); *Bianco v. IRS*, No. 93 Civ. 3953, 1994 WL 538020, at *2 (S.D.N.Y. Oct. 3, 1994) (claim regarding the state of taxpayer's records and requests for corrections barred by Anti-Injunction Act).

Preventing the IRS from taking any actions it rightfully may pursue to assess or collect any tax liability under the IRS without providing five days' notice to Debtor would vitiate the purpose of those provisions of the IRC.  As described in the complaint, the IRC authorizes the IRS, pursuant to IRC § 6213(b)(3), to assess and collect any tax liability relating to the tentative refund Debtor claimed without being required to provide notice.  Compl. ¶ 33.  In addition, the IRS has the right, pursuant to IRC §§ 6213, 6231, 6331 and 6861, to make a jeopardy assessment and collect on such assessment without providing any notice.  Compl. ¶ 34.  These provisions of the IRC are intended to provide the IRS with the necessary tools to act quickly to seize funds or at least establish a lien if it deems the funds to be in danger of being dissipated.  Therefore, the relief requested in Debtor's PI Motion and adversary complaint would defeat the purpose of the tools Congress provided to the IRS by the IRC.

Debtor argues that the Bankruptcy Code essentially trumps the IRC and allows a bankruptcy court to enjoin the IRS from taking actions regarding dozens of companies affiliated with Debtor *which are not* debtors in this or any Chapter 11 bankruptcy proceeding.  This requested relief is unprecedented.  Debtor relies on

26

one case from a New Jersey district court that issued an injunction against the IRS. *See* PI Motion ¶ 47 (citing *In re G-1 Holdings Inc.*, 420 B.R. 216, 281 (Bankr. D.N.J. 2009)). That case, however, ordered nothing like what Debtor seeks here. In confirming the plan of bankruptcy, and thus acting pursuant to Bankruptcy Code sections 1123 and 1141, the New Jersey court limited the IRS from collecting from affiliated non-debtor companies more than the amount IRS was entitled to receive under the bankruptcy plan from the Debtor.[4] *Id.* at 279. While *G-1 Holdings*' decision was novel regarding the purported waiver of the IRS's sovereign immunity, the court's rationale for its decision was that it was confirming a bankruptcy plan in which "the IRS has filed a proof of claim . . . [and] thus, [the IRS] is deemed to have waived sovereign immunity," *id.* at 280 n.69. *See also id.* at 280 ("the IRS is unimpaired under the Plan"). In the present case, however, there is no bankruptcy plan being confirmed under which the IRS is unimpaired, that could even arguably provide a basis under *G-1 Holdings* to enjoin the IRS. Moreover, under the *G-1 Holdings*' analysis, the court acknowledged that "a tension exists between the [IRC's] Anti-Injunction Act and the Bankruptcy Code." *Id.*

By purporting to rely on *G-1 Holdings* and seeking injunctive relief against the IRS in a different context – where the IRS has not filed a claim, where there is

---

[4] Debtor mischaracterizes the New Jersey court's holding. While that court did state *in dicta* that the Bankruptcy Code could provide authority to enjoin the IRS "if th[e] Court's order were to comprise an injunction barring the IRS from collecting against non-debtor affiliates," it specifically stated that "[b]y issuing an order that confirms section 2.4 of the Plan, [it] was not preventing the IRS from assessing against [the non-debtor affiliate], or other non-debtor affiliates." *G-1 Holdings*, 420 B.R. at 279.

no plan being confirmed, and where there is no indication that the IRS will be unimpaired under the bankruptcy plan – Ambac seeks to make new law abrogating the IRS's sovereign immunity.  Such an important federal issue regarding a conflict between the Bankruptcy Code and the IRC should be decided by the district court and warrants mandatory withdrawal of the reference.

*      *      *

Put simply, if Ambac is going to win this case, it is going to have to make substantial tax law in the process.  But where victory for either party turns on a substantial interpretation of the tax laws, the case should be litigated in district court.  Withdrawal of the reference is, for that reason, mandatory in this case.

## C.    This Court Should Withdraw the Reference as a Matter of Discretion

Even if withdrawal of the reference were not mandatory, this case would still belong in district court.  Section 157(d) provides that a "[d]istrict court *may* withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."  28 U.S.C. § 157(d) (emphasis supplied).  Although the statute does not define "cause,"

> in deciding whether to withdraw an issue from the bankruptcy court, the district court should weigh several factors, of which the first is the most important: (1) whether the claim is core or non-core, (2) what is the most efficient use of judicial resources, (3) what is the delay and what are the costs to the parties, (4) what will promote uniformity of bankruptcy administration, (5) what will prevent forum shopping, and (6) other related factors.

28

*South Street Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94

F.3d 755, 762 (2d Cir. 1996); *see also Orion Pictures Corp. v. Showtime Networks (In*

*re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993).

These factors weigh in favor of withdrawal of the reference.

### 1.    This Adversary Proceeding Is a Non-Core Proceeding

"A district court considering whether to withdraw the reference should first

evaluate whether the claim is core or non-core, since it is upon this issue that

questions of efficiency and uniformity will turn." *Orion Pictures*, 4 F.3d at 1101; *see*

*also Burger Boys*, 94 F.3d at 762 (identifying the core/non-core distinction as the

"most important" factor).  Generally, "a proceeding is core if it invokes a substantive

right provided by title 11 or if it is a proceeding, that by its nature, could arise only

in the context of a bankruptcy case." *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir.

1999) (internal citations omitted.).  *See also S.G. Phillips Constructors, Inc. v.*

*Burlington (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702, 706 (2d Cir. 1995)

("a claim filed against the estate is a core proceeding because it could arise only in

the context of bankruptcy"); *Sec. Farms v. Int. Bhd of Teamsters*, 124 F.3d 999, 1008

(9th Cir. 1997) ("Actions that do not depend on bankruptcy laws for their existence

and that could proceed in another court are considered 'non-core.").  *See generally*

28 U.S.C. § 157(b)(2) (providing non-exhaustive list of core proceedings).

An adversary proceeding brought by a debtor for the purpose of obtaining a

tax refund is not a core proceeding.  As the Ninth Circuit has squarely held, "tax

refund claims do not depend on Title 11 for their existence, but instead depend on

29

28 U.S.C. § 1346(a)(1), and the [debtor] could have brought them in the district court." *Dunmore v. United States*, 358 F.3d 1107, 1115 (9th Cir. 2004).

### 2. Withdrawal of the Reference Is in the Interests of Judicial Economy

Because this is a non-core proceeding, judicial economy also favors withdrawal. As noted in the discussion beginning on page 7, a bankruptcy judge can "hear and determine" core proceedings, 28 U.S.C. § 157(b), but may only submit proposed findings of fact and conclusions of law in non-core proceedings, which are to be reviewed *de novo* by a district judge, *see* 28 U.S.C. § 157(c). *See also Dunmore*, 358 F.3d at 1115 (bankruptcy court abused its discretion by entering final findings of fact and conclusions of law because tax refund adversary proceeding was non-core). Withdrawal of the reference will therefore streamline the litigation by having the district court address these non-core issues in the first instance. *See Orion Pictures*, 4 F.3d at 1101 ("the fact that a bankruptcy court's determination on non-core matters is subject to *de novo* review by the district court could lead the latter to conclude that in a given case unnecessary costs could be avoided by a single proceeding in the district court").

Litigating this case in district court also serves judicial economy because it will benefit immensely from the availability of a magistrate judge. Although the ultimate issues in the case may be legal ones, there is sure to be substantial discovery. The nature of the CDS contracts is a critical area for discovery. In addition to discovery related to the CDS contracts themselves, there will

undoubtedly be significant discovery into the methods of accounting used by Ambac and the change in Ambac's change in the method of accounting. Additionally, Ambac is relying upon an opinion letter drafted by KPMG, which defense will also be grounds for extensive discovery. To the extent advice of counsel is presented as a defense by Ambac, it could be expected that attorney-client privilege disputes will arise. All of these issues would benefit from the skills of a magistrate judge.

### 3. Withdrawal of the Reference Will Save the Parties From Cost and Delay

Withdrawal of the reference will also spare the parties unnecessary time and money. Again, because the bankruptcy court is constrained to issue only proposed findings of fact and conclusions of law, absent withdrawal the parties will have to fully litigate this case in the bankruptcy court and then bring that court's proposed rulings here, where they may be entirely re-litigated. "Withdrawal of the reference to the bankruptcy court would prevent the inevitable delay and cost to the parties of such a duplication." *Kohn v. Haymount Ltd. P'ship (In re Int'l Benefits Group, Inc.)*, No. 06-2363 (KSH), 2006 WL 2417297, at *3 (D.N.J. Aug. 21, 2006).

### 4. Withdrawal Will Not Affect Administration of the Bankruptcy

Even if Debtor is correct that the dispute regarding the tax liability is central to the bankruptcy, *see* Compl. ¶ 1, this does not outweigh the other factors that favor permissive withdrawal of the reference in this case.

### 5.    Forum Shopping Is Not an Issue Here

Last, forum shopping is not an issue here because this case will ultimately be decided by a district court.  If this Court were to deny this motion, another judge in this district would end up deciding the same issues *de novo* after the bankruptcy court makes its proposed findings.

*      *      *

The factors weigh heavily in favor of permissive withdrawal.  Forcing this case to be litigated to the end in bankruptcy court, only to begin again in district court years from now would be pointless.

### CONCLUSION

The Court should grant the Government's motion to withdraw the reference, and assume jurisdiction over this adversary proceeding.

Dated:  New York, New York
        January 13, 2011

PREET BHARARA
United States Attorney for the
Southern District of New York

By:     s/ Daniel P. Filor
        DANIEL P. FILOR
        ELLEN M. LONDON
        Assistant United States Attorneys
        86 Chambers Street -- 3rd Floor
        New York, New York 10007
        Telephone: (212) 637-2726
        Facsimile:  (212) 637-2717
        Email: Daniel.Filor@usdoj.gov
        *Attorneys for the United States of America*

32